USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/8/08

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------X

ELIOT I. BERNSTEIN, *et al.*,

        **Plaintiffs,**

    - against -

STATE OF NEW YORK, *et al.*,

        **Defendants.**

--------------------------------------------------------X

**OPINION AND ORDER**

**07 Civ. 11196 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.   INTRODUCTION

This action presents a dramatic story of intrigue, car bombing, conspiracy, video technology, and murder.  In short, plaintiffs allege that hundreds of defendants engaged in a massive conspiracy to violate their civil rights and, in the process, contributed to the Enron bankruptcy and the presidency of George W. Bush.  In plaintiffs' words:

> Plaintiffs depict a conspiratorial pattern of fraud, deceit, and misrepresentation, that runs so wide and so deep, that it tears at the very fabric, and becomes the litmus test, of what has come to be known as free commerce through inventors' rights and due process in this country, and in that the circumstances involve inventors' rights tears at the very fabric of the Democracy protected under the

1

Constitution of the United States.[1]

Defendants characterize the events quite differently:

> For many years, *pro se* Plaintiffs Eliot I. Bernstein and
> Plaintiff Stephen Lamont have engaged in a defamatory
> and harassing campaign . . . alleging an immense global
> conspiracy . . . .    Although largely unintelligible, the
> [Amended Complaint] purports to describe a fantastic
> conspiracy among members of the legal profession, judges
> and government officials and private individuals and
> businesses to deprive plaintiffs of what they describe as
> their "holy grail" technologies.[2]

While I cannot determine which of these descriptions is more

accurate, I can and do conclude that plaintiffs have failed to state a claim against

any of the hundreds of defendants named in this action.  For the reasons stated

below, plaintiffs' claims are dismissed.

## II.    BACKGROUND

### A.    Facts

The following factual allegations, taken from the Amended

Complaint, are accepted as true for purposes of this motion.  Because the

Complaint comprises more than one thousand paragraphs, the facts presented here

---

[1]      Amended Complaint ("Compl.") ¶ 7.

[2]      Memorandum of Law in Support of the Proskauer Defendants'
Motion to Dismiss, at 1.

are by necessity a summary and a selection of the most pertinent allegations.

###    1.    Development and Theft of the Video Technology

The story begins in 1997, when plaintiff Eliot Bernstein and others[3]

invented video technologies (the "Inventions").[4]  The Inventions permit

transmission of video signals using significantly less bandwidth than other

technologies.[5]  They also provide a way to "zoom almost infinitely on a low

resolution file with clarity,"[6] something that is generally believed to be impossible.

The Inventions were quickly incorporated into "almost every digital camera and

present screen display device" and they "played a pivotal part in changing the

Internet from a text based medium to a medium filled with magnificent images and

video, thought prior to be impossible on the limited bandwidth of the Internet."[7]

They are also used by DVDs, televisions, cable television broadcasting, certain

---

[3]    The other inventors apparently include Zakirul Shirajee, Jude
Rosario, Jeffrey Friedstein, James F. Armstrong, and others. *See* Compl. ¶ 254.
These individuals are not parties to this case.

[4]    *See id.* ¶ 240.

[5]    *See id.* ¶ 242.

[6]    *Id.*

[7]    *Id.* ¶¶ 241, 242.

3

websites, and "chips," presumably integrated circuits.[8]

In 1998, Bernstein's accountant, Gerald R. Lewin, suggested that Bernstein contact Albert T. Gortz, an attorney at Proskauer Rose LLP, regarding the Inventions.[9]  Gortz, an estate planner, put Bernstein in contact with Proskauer partner Christopher C. Wheeler, a real estate attorney, who told Bernstein that he would determine whether Proskauer's New York office had partners with appropriate experience in patent law.[10]  Several weeks later, they represented that partners Kenneth Rubenstein and Raymond A. Joao would secure patents for the Inventions and would perform other trademark, trade secret, and copyright work.[11] Apparently impressed by the Inventions, Proskauer agreed to accept 2.5% of the equity of Iviewit, Inc., the company that owned the Inventions, in return for its services.[12]  Unbeknownst to Bernstein, Rubenstein and Joao did not at the time work for Proskauer.[13]  Rubenstein subsequently joined Proskauer, but Joao

---

[8]     *Id.* ¶ 244.

[9]     *See id.* ¶ 254.

[10]    *See id.*

[11]    *See id.* ¶¶ 254-255.  While patents for the Inventions were apparently secured, those patents are currently suspended. *See id.* ¶ 282.

[12]    *See id.* ¶¶ 256-257.

[13]    *See id.* ¶ 258.

4

remained at the firm Meltzer Lippe Goldstein Wolf & Schlissel, P.C. ("MLG")[14]

Rubenstein was also counsel to MPEGLA LLC, one of the largest users of the Inventions. When he was hired by Proskauer, MPEGLA became Proskauer's client. MPEGLA bundled the Inventions in with other technologies that they license, but did not pay Iviewit any royalties.[15] In fact, plaintiffs allege that Rubenstein was part of a scheme to steal the Inventions.[16] Apparently as part of this scheme, Joao filed for more than ninety related patents in his own name.[17] Then, to mask the theft, Proskauer created numerous illegitimate companies with names similar to that of Iviewit in various jurisdictions (the "Similar Companies").[18] Proskauer filed defective patent applications for Iviewit and valid applications for the Similar Companies.[19]

Proskauer then brought in representatives from Real (a consortium that at the time comprised Intel; Silicon Graphics, Inc.; and Lockheed Martin, and

---

[14]     *See id.* ¶ 261.

[15]     *See id.* ¶ 262.

[16]     *See id.* ¶ 268.

[17]     *See id.* ¶ 270.

[18]     *See id.* ¶ 273. Many of these companies have been named as defendants.

[19]     *See id.* ¶ 274.

that was later acquired by Intel).[20]  Real made use of the Inventions without first

arranging for a license from Iviewit.[21]  Proskauer required Real and other

interested parties to sign non-disclosure agreements, but did not enforce these

agreements.[22]

Proskauer also distributed the Inventions to Enron Broadband.  Enron

"booked enormous revenue through [Enron Broadband] without a single movie to

distribute," but because they lost use of the Inventions, the deal "collapsed over

night causing massive losses to Enron investors" – indeed, plaintiffs allege that

this may be "one of the major reasons for Enron's bankruptcy."[23]

Meanwhile, Proskauer pursued investors for the Similar Companies.

Using fraudulent documents, they secured millions of dollars from the Small

Business Administration, Goldman Sachs, Gruntal & Co., Wachovia Securities,

and various others,[24] including defendant Huizenga Holdings, Inc.[25]  Plaintiffs also

---

[20]    *See id.* ¶ 277.

[21]    *See id.* ¶ 278.

[22]    *See id.* ¶ 297.

[23]    *Id.* ¶¶ 358, 361, 363.

[24]    *See id.* ¶¶ 284, 316-318.

[25]    *See id.* ¶ 276.

6

allege that in March of 2001, the Tiedemann Investment Group ("TIG") invested several hundred thousand dollars in the Similar Companies.[26]  Plaintiffs suggest that some of this money may have been stolen.[27]

### 2.    Discovery of the Theft

Almost immediately after Joao began work on the patents, Bernstein discovered that Joao had made changes to the patent applications after they were signed.  Bernstein forced Joao to fix the applications, mailed them, and then dismissed Joao.[28]  Joao was replaced by William J. Dick, Douglas A. Boehm, and Steven C. Becker of Foley & Lardner LLP ("Foley").[29]  But they too filed false papers, not only with the U.S. Patent and Trademark Office ("PTO"), but with various foreign patent offices.[30]

Bernstein began to discover the full extent of the scheme.  To ensure Bernstein's silence, Brian G. Utley, President of one of the Similar Companies, flew to Iviewit's California office and told Bernstein that "if he did not shut up

---

[26]    *See id.* ¶ 295.

[27]    *See id.*

[28]    *See id.* ¶¶ 301-303.

[29]    *See id.* ¶ 307.

[30]    *See id.* ¶ 311.

about what was discovered . . . that he and law firms [sic] would destroy him, his family and his companies."[31]  Utley explained that if he were not made CEO, Bernstein and his family would be in danger from Proskauer and from Foley.[32]  In response, Bernstein told his wife and children to flee their home.[33]  Bernstein also attempted to have all corporate records from Iviewit's Florida office shipped to California, though defendants were able to destroy many of those documents before they could be shipped.[34]  Utley and Michael Reale, Vice President of Operations for one of the Similar Companies, told Iviewit's Florida employees that they were fired and should join the Similar Companies.[35]  Utley and Reale also stole equipment that belonged to Iviewit, leading to the filing of charges with the Boca Raton Police Department.[36]  Not satisfied with threats, defendants blew

---

[31]    *Id.* ¶ 287.

[32]    *See id.* ¶ 337.

[33]    *See id.* ¶ 338.

[34]    *See id.* ¶ 348.

[35]    *See id.* ¶ 352.

[36]    The department apparently failed to investigate these charges, and Bernstein has filed a corruption charge with the department's Chief and with internal affairs. *See id.* ¶ 356.

up Bernstein's car.[37]  Fortunately for Bernstein, he was not in the vehicle at the time.[38]

Plaintiffs contacted the New York Attorney General's Office and requested that the Attorney General and the New York State Disciplinary Committee open an investigation into the actions of these attorneys.[39]  "For his failure to respond to the earlier complaints, former [New York Attorney General] Eliot Spitzer and [the New York Attorney General] have also been included herein as defendants . . . ."[40]

Meanwhile, in the year 2000, Arthur Andersen LLP began an audit of the Similar Companies.[41]  Arthur Andersen discovered some of these irregularities and requested clarifying information from certain parties, including Proskauer, which provided false information to prevent Arthur Andersen from discovering the full extent of the fraud.[42]

---

[37]    *See id.* ¶ 288.

[38]    *See id.*

[39]    *See id.* ¶ 319.

[40]    *Id.* ¶ 320.

[41]    *See id.* ¶ 321.

[42]    *See id.* ¶¶ 323-324.

Bernstein also discovered a federal bankruptcy action filed in the Southern District of Florida.[43] In this case, defendant RYJO Inc., a subcontractor for Intel and Real, was attempting to steal some of the Inventions.[44] Defendant Houston & Shady, P.A. were counsel to Intel and Real in this action, which was filed in 2001.[45] This case was dropped after it was discovered by Iviewit.[46]

Bernstein also learned of *Proskauer Rose LLP v. Iviewit.com, Inc.*,[47] an action in Florida state court presided over by defendant the Hon. Jorge Labarga, Justice of the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida.[48] Bernstein and Iviewit fired the attorneys who claimed to be representing Iviewit, Sachs Saxs & Klein, P.A., and retained new counsel, Steven Selz and Schiffrin Barroway Topaz & Kessler, LLP ("SBTK"), to represent the Iviewit companies in these actions.[49] Unfortunately for Iviewit, SBTK joined in

---

[43]    This is alleged to be case no. 01-33407-BKC-SHF.

[44]    *See* Compl. ¶¶ 369, 371.

[45]    *See id.* ¶ 443.

[46]    *See id.* ¶ 426.

[47]    No. CA 01-04671 AB10 (15th Jud. Cir. Ct., Palm Beach Co., Fla.).

[48]    *See* Compl. ¶ 377.

[49]    *See id.* ¶ 380.

the conspiracy with Proskauer.[50]

The Complaint also alleges that Justice Labarga was part of the conspiracy and finds substantial fault with his handling of the case.[51]  In fact, plaintiffs suggests that the Iviewit case may have distracted Justice Labarga from his work on *Bush v. Gore*, leading possibly to its result.[52]  Labarga granted a default judgment against Iviewit.[53]

In 2003, Plaintiffs filed a complaint with the Florida Bar that alleges Wheeler and Proskauer violated various ethical rules.[54]  However, the Florida Bar failed to give the complaints due consideration.[55]  Plaintiffs therefore appealed to

---

[50]     *See id.* ¶ 390.

[51]     *See, e.g., id.* ¶ 402.

[52]     *See id.* ¶ 394 ("That on information and belief, it then became apparent that Labarga was not only part of the conspiracy but in the words of the Supreme Court Justice, Sandra Day O'Connor, in relation to the Florida Supreme Court election recount in the Bush v. Gore presidential election that Labarga was central too [sic], that he was 'off on a trip of his own...,' perhaps referring to the Iviewit Companies matters which were consuming him at the same time.") (quoting Jan Crawford Greenburg, *Supreme Conflict: The Inside Story of the Struggle for Control of the United States Supreme Court* (2007)).

[53]     *See id.* ¶ 414.

[54]     *See id.* ¶ 544.

[55]     *See id.* ¶ 547.

the Florida Supreme Court,[56] but that court closed the case "without explanation or basis in law."[57] The events involving Florida lasted from Spring 2003 to Spring 2004.[58]

### 3. Further Cover-up

As mentioned earlier, plaintiffs had filed complaints with the New York Appellate Division, First Department Disciplinary Committee ("1st DDC") against Rubenstein, Joao, and Proskauer itself. But Proskauer arranged for defendant Steven C. Krane, a partner at Proskauer and member of the 1st DDC, to have the complaints delayed and then dismissed.[59] Plaintiffs discovered Krane's involvement on May 20, 2004.[60] They filed a complaint against Krane with the 1st DDC. Believing Krane to be conflicted in his representation of Proskauer, plaintiffs contacted Catherine O'Hagan Wolfe, then the Clerk of the First Department, but the First Department took no action, allegedly because of the

---

[56]     *See id.* ¶ 595.

[57]     *Id.* ¶ 600. The Florida Supreme Court denied Bernstein's appeal in 2005 in a one-line decision. *See Bernstein v. The Florida Bar*, 902 So. 2d 789, 789 (Fla.) (table decision) ("Disposition: All Writs den."), *cert. denied*, 546 U.S. 1040 (2005).

[58]     *See* Compl. ¶ 607.

[59]     *See id.* ¶ 612.

[60]     *See id.* ¶ 610.

involvement of the judges of the First Department in the conspiracy.[61]

In July of 2004, Plaintiffs filed a formal complaint with the First Department.[62] The First Department voted to begin investigating Rubenstein, Proskauer, Krane, MLG, and Joao and transferred the investigation to the Second Department Disciplinary Committee ("2d DDC"), which refused to pursue it.[63] Plaintiffs also contacted defendant the Hon. Judith Kaye, Chief Judge of the New York Court of Appeals, but "she failed to intervene . . . ."[64]

Plaintiffs also requested an investigation by the New York Lawyers' Fund for Client Protection. It declined because it too was controlled by the conspiracy.[65] Plaintiffs had a similar experience with the State of New York Commission of Investigation.[66] They then contacted Eliot Spitzer, then-Attorney General of the State of New York, but he too conspired with defendants and

---

[61]   *See id.* ¶ 624.

[62]   *See id.* ¶ 646.

[63]   *See id.* ¶ 650.

[64]   *Id.* ¶ 686.

[65]   *See id.* ¶ 688.

[66]   *See id.* ¶ 687.

refused to investigate.[67]  Similar inquiries with the Virginia State Bar were unsuccessful.[68]

### B.    Claims

Plaintiffs allege that the conspiracy violated their rights to due process pursuant to the Fifth and Fourteenth Amendments (count one).[69]  They also allege antitrust activity in violation of sections 1 and 2 of Title 15 of the United States Code (count two).[70]  They further charge violation of Title VII of the Civil Rights Act of 1964 (count three)[71] and the Racketeering and Corrupt Organizations Act (count four).[72]  In addition, plaintiffs allege a series of state law claims, including legal malpractice, breach of contract, tortious interference, negligent interference with contractual rights, fraud, breach of fiduciary duties, misappropriation of funds, and conversion.  For each count, plaintiffs request one trillion dollars in compensatory damages and punitive damages.  Plaintiffs also

---

[67]    *See id.* ¶ 689.

[68]    *See id.* ¶ 692.

[69]    *See id.* ¶¶ 1067-1070.

[70]    *See id.* ¶¶ 1071-1074.

[71]    *See id.* ¶¶ 1075-1078.

[72]    *See id.* ¶¶ 1079-1082.

request an injunction to prevent the unauthorized use of the Inventions, although

they acknowledge that "the granting of this prayer for relief, effectively, halts the

transmission of and viewing of video as we know it . . . ."[73]  They further request

that the Court appoint a federal monitor to oversee the operations of the First and

Second Department Disciplinary Committees, the Florida Bar, the United States

Patent and Trademark Office, the Federal Bureau of Investigation, the United

States Attorney's Office, and the Virginia Bar Association.[74]  Plaintiffs further

seek an injunction to correct all past wrongdoing and ask the Court to request the

Attorney General to institute civil or criminal proceedings.

> The precise basis for plaintiffs' first claim is unclear.  They allege:
>
> The conspiratorial actions of the defendants in sabotaging IP applications through fraud and theft, and the ensuing white washing of attorney complaints by the defendants and other culpable parties both known and unknown with scienter, thereby continuing the violation of Plaintiffs inventive rights is contrary to the inventor clause of the Constitution of the United States as stated in Article 1, Section 8, Clause 8, and the due process clauses of the Fifth Amendment to the Constitution of the United States, and Fourteenth Amendment to the Constitution of the United States.[75]

---

[73]    *Id.* ¶ XIII.

[74]    *See id.* ¶ XIV.

[75]    *Id.* ¶ 1069.

In the interest of construing the Complaint liberally, the Court will assume that plaintiffs mean to plead due process violations and a violation of the Patent Clause.

## III.   APPLICABLE LAW

### A.   Standard of Review

"Federal Rule of Civil Procedure 8(a)(2) requires . . . 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"[76]  When deciding a defendant's motion to dismiss under Rule 12(b)(6), courts must "accept as true all of the factual allegations contained in the complaint"[77] and "draw all reasonable inferences in plaintiff's favor."[78]  Likewise, when deciding a motion for judgment on the pleadings, a court "must accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor."[79]

Nevertheless, to survive a Rule 12(b)(6) motion to dismiss, the

---

[76]    *Erickson v. Pardus*, — U.S. —, 127 S. Ct. 2197, 2200 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).

[77]    *Bell Atl. Corp. v. Twombly*, — U.S. —, 127 S. Ct. 1955, 1964 (2007).

[78]    *Ofori-Tenkorang v. American Int'l Group*, 460 F.3d 296, 298 (2d Cir. 2006).

[79]    *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001) (citing *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 644 (2d Cir. 1998)).

16

allegations in the complaint must meet the standard of "plausibility."[80] Although

the complaint need not provide "detailed factual allegations,"[81] it must "amplify a

claim with some factual allegations . . . to render the claim *plausible*."[82] The test is

no longer whether there is "'no set of facts [that plaintiff could prove] which

would entitle him to relief.'"[83] Rather, the complaint must provide "the grounds

upon which [the plaintiff's] claim rests through factual allegations sufficient 'to

raise a right to relief above the speculative level.'"[84]

　　　　Although this Court must take the plaintiff's allegations as true, "the

claim may still fail as a matter of law . . . if the claim is not legally feasible."[85] In

---

[80]　*Bell Atl.*, 127 S. Ct. at 1970.

[81]　*Id*. at 1964. *See also ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 n.2 (2d Cir. 2007) (applying the standard of plausibility outside *Bell Atlantic*'s anti-trust context) .

[82]　*Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (holding that the plaintiff's complaint adequately alleged the personal involvement of the Attorney General because it was plausible that officials of the Department of Justice would be aware of policies concerning individuals arrested after the events of September 11, 2001).

[83]　*Bell Atl.*, 127 S. Ct. at 1968 (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

[84]　*ATSI Commc'ns*, 493 F.3d at 98 (quoting *Bell Atl.*, 127 S. Ct. at 1965).

[85]　*Allaire Corp. v. Okumus*, 433 F.3d 248, 250 (2d Cir. 2006).

17

addition, "bald assertions and conclusions of law will not suffice."[86]

Courts must construe pro se complaints liberally.[87]  However, a litigant's pro se status does not exempt him from compliance with the relevant rules of procedural and substantive law.[88]

## B.  Rule 8(a)

"[T]he principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial."[89]  "The statement should be short because '[u]nnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage.'"[90]

If a pleading fails to comply with Rule 8(a), the court may strike

---

[86]  *Law Offices of Curtis V. Trinko, L.L.P. v. Bell Atl. Corp.*, 309 F.3d 71, 74 (2d Cir. 2002) (quotation omitted).

[87]  *See Lerman v. Board of Elections in the City of N.Y.*, 232 F.3d 135, 140 (2d Cir. 2000).  *See also Haines v. Kerner*, 404 U.S. 519, 596 (1972) (providing that courts should hold "allegations of [] pro se complaint[s] . . . to less stringent standards than formal pleadings drafted by lawyers.").

[88]  *See Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983).

[89]  *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988).

[90]  *Id.* (quoting C. Wright & A. Miller, 5 *Federal Practice and Procedure* § 1281 (1969)).

redundant or immaterial portions or, if "the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised," dismiss the complaint entirely.[91]  It is generally an abuse of discretion to deny leave to amend when a complaint is dismissed for this reason.[92]

### C.     Civil Rights Claims

#### 1.     Constitutional Cause of Action

Plaintiffs have alleged that defendants violated their rights pursuant to the Fifth and Fourteenth Amendments.  Typically such claims are brought under section 1983 of Title 42 of the United States Code.  However, plaintiffs have apparently alleged direct violations of their constitutional rights.

The Supreme Court has permitted a direct cause of action for violation of a constitutional right in certain circumstances.  For example, in some circumstances plaintiffs can sue for violations of the Fourth Amendment by the federal government.[93]  But such actions are not permitted if "Congress has

---

[91]     *Id.*

[92]     *See id.* (citing *Gordon v. Green*, 602 F.2d 743, 745-47 (5th Cir. 1979), in which the court ruled that plaintiffs should have been given leave to amend a 4000-page complaint) (other citations omitted).

[93]     *See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

provided an alternative remedy which it explicitly declared to be a substitute for recovery directly under the Constitution and viewed as equally effective."[94]

"The availability of a § 1983 action precludes an action for direct relief under the constitution."[95]  Because a section 1983 action is available here, plaintiffs' direct constitutional claims are dismissed.[96]

However, "[s]ince the two causes of action are virtually identical, it would be most unfair to [these] pro se plaintiff[s] and entirely unnecessary, to dismiss [their] direct constitutional action without leave to replead the exact same constitutional violation in the guise of a Section 1983 action."[97]  Such a result would be a waste of time and energy.  Instead, I deem the Complaint to have pled

---

[94]     *Carlson v. Green*, 446 U.S. 14, 18-19 (1980) (citing *Bivens*, 403 U.S. at 397).

[95]     *Gleason v. McBride*, 715 F. Supp. 59, 62-63 (S.D.N.Y. 1988) (citing *Turpin v. Mailet*, 591 F.2d 426, 427 (2d Cir. 1979); *Williams v. Bennett*, 689 F.2d 1370, 1390 (11th Cir. 1982); *Tarpley v. Greene*, 684 F.2d 1, 10-11 (D.C. Cir. 1982); *Ward v. Caulk*, 650 F.2d 1144, 1147 (9th Cir. 1981)), *rev'd in part on other grounds*, 869 F.2d 688 (2d Cir. 1989)).

[96]     Plaintiffs have alleged that certain defendants, who are non-state actors, violated their rights under the Fifth and Fourteenth Amendments.  Neither a section 1983 action nor a direct constitutional action is available against these defendants because the conduct of non-state actors is not governed by those amendments.  Both a direct due process claim and a section 1983 claim require state action.

[97]     *Lombard v. Board of Educ. of the City of N.Y.*, 784 F. Supp. 1029, 1035 (E.D.N.Y. 1992).

a claim pursuant to section 1983.

## 2.    Section 1983

Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere."[98] In order to state a claim under section 1983, a plaintiff must show that the conduct complained of was committed by a person or entity acting under color of state law, and that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution.[99]

The statute of limitations for an action under section 1983 is three years.[100] "Although federal law determines when a section 1983 claim accrues, state tolling rules determine whether the limitations period has been tolled, unless state tolling rules would 'defeat the goals' of section 1983."[101] In New York, "the doctrines of equitable estoppel and equitable tolling can prevent a defendant from

---

[98]    *Morris-Hayes v. Board of Educ. of Chester Union Free Sch. Dist.*, 423 F.3d 153, 159 (2d Cir. 2005) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)).

[99]    *See Palmieri v. Lynch*, 392 F.3d 73, 78 (2d Cir. 2004).

[100]    *See Patterson v. County of Oneida, N.Y.,* 375 F.3d 206, 225 (2d Cir. 2004).

[101]    *Abbas v. Dixon*, 480 F.3d 636, 641 (2d Cir. 2007) (quoting *Pearl v. City of Long Beach*, 296 F.3d 76, 80 (2d Cir. 2002)).

pleading the statute of limitations as a defense where, by fraud, misrepresentation, or deception, he or she had induced the plaintiff to refrain from filing a timely action."[102] "Equitable estoppel is applicable where the plaintiff knew of the existence of the cause of action, but the defendant's misconduct caused the plaintiff to delay in bringing suit. Equitable tolling, on the other hand, is applicable where the defendant has wrongfully deceived or misled the plaintiff in order to conceal the existence of a cause of action."[103]

### 3. The Right to an Investigation

"[T]he Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual."[104] "[C]ourts within the Second Circuit have determined that '[t]here is . . . no constitutional right to an investigation by government officials.'"[105] Thus,

---

[102]   *Kotlyarsky v. New York Post*, 757 N.Y.S.2d 703, 706 (Sup. Ct. Kings Co. 2003) (citing *Simcuski v. Saeli*, 44 N.Y.2d 442, 406 (2d Dep't 1978)) (other citations omitted). *Accord Holmberg v. Armbrecht*, 327 U.S. 392, 396-97 (1946) (explaining that a statute of limitations will be tolled if material facts are concealed).

[103]   *Kotlyarsky*, 757 N.Y.S.2d at 707 (citations omitted).

[104]   *DeShaney v. Winnebago Soc. Servs.*, 489 U.S. 189, 196 (1989).

[105]   *Nieves v. Gonzalez*, No. 05 Civ. 17, 2006 WL 758615, at *4 (W.D.N.Y. Mar. 2, 2006) (quoting *Bal v. City of New York*, No. 94 Civ. 4450,

there is no constitutional violation where the government refuses to investigate a crime, allegations of patent fraud, or an attorney ethics grievance.[106]

### D.    The Sherman Act

The Sherman Act, which forbids certain monopolistic practices, provides that actions under the Act "shall be forever barred unless commenced within four years after the cause of action accrued."[107]  "Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business."[108]

### E.    Racketeer Influenced and Corrupt Organizations ("RICO")

A plaintiff claiming a civil RICO violation must allege each of the claim's elements, including "(1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity."[109]  In considering civil RICO claims, a court must be

---

1995 WL 46700, at *2 (S.D.N.Y. Feb. 7), *aff'd*, 99 F.3d 402 (2d Cir. 1995)) (alterations in *Nieves*).

[106]    *See Longi v. County of Suffolk*, No. CV-02-5821, 2008 WL 858997, at *6 (E.D.N.Y. Mar. 27, 2008) ("[T]here is no constitutional right to an investigation by government officials.").

[107]    15 U.S.C. § 15b.

[108]    *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971).

[109]    *Anatian v. Coutts Bank (Switzerland) Ltd.*, 193 F.3d 85, 88 (2d Cir. 1999) (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).

mindful of the devastating effect such claims may have on defendants.[110]  Civil

RICO should not be used to transform a "garden variety fraud or breach of

contract case[] . . . into a vehicle for treble damages."[111]  The statute of limitations

for civil RICO claims is four years.[112]

### F.    Immunity

#### 1.    The Eleventh Amendment

The Eleventh Amendment to the United States Constitution provides

that "[t]he Judicial power of the United States shall not be construed to extend to

any suit in law or equity, commenced or prosecuted against one of the United

States by Citizens of another State, or by Citizens or Subjects of any Foreign

---

[110]    *See Kirk v. Heppt*, No. 05 Civ. 9977, 2006 WL 689510, at *2 (S.D.N.Y. Mar. 20, 2006) ("Because the mere assertion of a RICO claim . . . has an almost inevitable stigmatizing effect on those named as defendants, . . . courts should strive to flush out frivolous RICO allegations at an early stage of the litigation.") (citations and quotation marks omitted).

[111]    *Goldfine v. Sichenzia*, 118 F. Supp. 2d 392, 394 (S.D.N.Y. 2000). *Accord Kirk*, 2006 WL 689510, at *2 (observing that courts "must be wary of putative civil RICO claims that are nothing more than sheep masquerading in wolves' clothing"); *Schmidt v. Fleet Bank*, 16 F. Supp. 2d 340, 346 (S.D.N.Y. 1998) (noting that because civil RICO "is an unusually potent weapon – the litigation equivalent of a thermonuclear device . . . courts must always be on the lookout for the putative RICO case that is really nothing more than an ordinary fraud case clothed in the Emperor's trendy garb").

[112]    *Agency Holding Corp. v. Malley-Duff & Assocs.*, 483 U.S. 143, 156 (1987).

24

State." Because the States have sovereign immunity against claims in federal

court, a private citizen cannot sue a State unless the State has consented or

Congress has abrogated that immunity.[113] "This jurisdictional bar also immunizes

a state entity that is an 'arm of the State,' including, in appropriate circumstances,

a state official acting in his or her official capacity."[114]

However, under the rule of *Ex parte Young*,[115] "'a plaintiff may sue a

state official acting in his official capacity – notwithstanding the Eleventh

Amendment – for prospective, injunctive relief from violations of federal law.'"[116]

This relief requires that there be an ongoing violation of federal law.[117]

---

[113]     *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996).
Although the text of the Amendment suggests that it does not prohibit a citizen
from suing his own state in federal court, the Supreme Court has explained that the
Amendment clarifies that the States enjoy broad sovereign immunity, including
immunity in federal court from suits brought by their citizens. *See Hans v.
Louisiana*, 134 U.S. 1 (1890).

[114]     *In re Deposit Ins. Agency*, 482 F.3d 612, 617 (2d Cir. 2007) (citing
*Northern Ins. Co. of N.Y. v. Chatham County, Ga.*, 547 U.S. 189 (2006); *Edelman
v. Jordan*, 415 U.S. 651, 663 (1974)).

[115]     209 U.S. 123 (1908).

[116]     *State Employees Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 95
(2d Cir. 2007) (quoting *In re Deposit Ins. Agency*, 482 F.3d at 617).

[117]     *See id.* at 96 ("We are specifically required by *Ex parte Young* to
examine whether there exists an ongoing violation of federal law.") (citing
*Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)).

"Although the Supreme Court has not specifically ruled on this burden question, circuit courts that have done so have unanimously concluded that 'the entity asserting Eleventh Amendment immunity has the burden to show that it is entitled to immunity.'"[118] To determine whether a state agency is entitled to immunity under the Eleventh Amendment, the Second Circuit has prescribed six factors: "'(1) how the entity is referred to in the documents that created it; (2) how the governing members of the entity are appointed; (3) how the entity is funded; (4) whether the entity's function is traditionally one of local or state government; (5) whether the state has a veto power over the entity's actions; and (6) whether the entity's obligations are binding upon the state.'"[119] If these are not dispositive, "a court focuses on the twin reasons for the Eleventh Amendment: (1) protecting the dignity of the state, and (2) preserving the state treasury."[120] "If the outcome still remains in doubt, then whether a judgment against the governmental entity would be paid out of the state treasury generally determines the application of

---

[118]    *Woods v. Rondout Valley Central School Dist. Bd of Educ.*, 466 F.3d 232, 237 (2d Cir. 2006) (quoting *Gragg v. Kentucky Cabinet for Workforce Dev.*, 289 F.3d 958, 963 (6th Cir. 2002) (citations omitted)).

[119]    *Id.* at 240 (quoting *Mancuso v. New York State Thruway Auth.*, 86 F.3d 289, 293 (2d Cir. 1996)).

[120]    *Id.* (citing *Mancuso*, 86 F.3d at 293).

Eleventh Amendment immunity."[121]

## 2.    Judicial Immunity

Judges have absolute immunity from suits for acts performed in their judicial capacities. Even if a judge acts maliciously, a litigant's remedy is to appeal, not to sue the judge. Judicial immunity can be overcome only where a judge completely lacks jurisdiction over the subject matter. This immunity also extends to the institution of the court itself, as well as its supporting offices.

It is "well-established that officials acting in a judicial capacity are entitled to absolute immunity against § 1983 actions, and this immunity acts as a complete shield to claims for money damages."[122] "Absolute immunity extends not only to judges and prosecutors, but also to officials who perform functions closely associated with the judicial process, including parole board officials conducting parole hearings, federal hearing examiners, administrative law judges, and law clerks."[123]

---

[121]    *Id.* at 241.

[122]    *Montero v. Travis*, 171 F.3d 757, 760 (2d Cir. 1999).

[123]    *Roe v. Johnson*, 334 F. Supp. 2d 415, 423 (S.D.N.Y. 2004) (citing *Cleavinger v. Saxner*, 474 U.S. 193, 200 (1985) (hearing examiners and administrative law judges); *Montero*, 171 F.3d at 760 (parole board officials); *Oliva v. Heller*, 839 F.2d 37, 40 (2d Cir. 1988) (law clerks)).

Judicial immunity was created "for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences."[124] "Thus, if the relevant action is judicial in nature, the judge is immune so long as it was not taken in the complete absence of jurisdiction."[125] Quasi-judicial immunity protects administrative officers who act in a judicial manner.[126] Attorney disciplinary proceedings are "judicial in nature,"[127] so the presiding officers are protected by absolute immunity. However, neither judicial immunity nor quasi-judicial immunity bars a claim for prospective injunctive relief.[128]

---

[124]   *Pierson v. Ray*, 386 U.S. 547, 554 (1967).

[125]   *Huminski v. Corsones*, 396 F.3d 53, 75 (2d Cir. 2005). *Accord Stump v. Sparkman*, 435 U.S. 349, 356-57 (1978) ("A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the 'clear absence of all jurisdiction.'").

[126]   *See Sassower v. Mangano*, 927 F. Supp. 113, 120 (S.D.N.Y. 1996) ("Under the doctrine of quasi-judicial immunity, absolute immunity extends to administrative officials performing discretionary acts of a judicial nature.").

[127]   *Middlesex County Ethics Comm. v. Garden State Bar Assoc.*, 457 U.S. 423, 433-34 (1982) ("It is clear beyond doubt that the New Jersey Supreme Court considers its bar disciplinary proceedings as 'judicial' in nature.").

[128]   *See Pulliam v. Allen*, 466 U.S. 522, 541-42 (1984) ("We conclude that judicial immunity is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity.").

### 3.    Qualified Immunity

The doctrine of qualified immunity protects government officials from civil liability if the officials' conduct "'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[129]  Qualified immunity balances "'the need . . . to hold responsible public officials exercising their power in a wholly unjustified manner and . . . [the need] to shield officials responsibly attempting to perform their public duties in good faith from having to explain their actions to the satisfaction of a jury.'"[130] Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law."[131]  Qualified immunity is "a defense afforded only to individuals – not municipalities or municipal agencies."[132]  "[A]n official sued in his official capacity may not take advantage of a qualified

---

[129]     *Velez v. Levy*, 401 F.3d 75, 100 (2d Cir. 2005) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[130]     *Locurto v. Safir*, 264 F.3d 154, 162-63 (2d Cir. 2001) (quoting *Kaminsky v. Rosenblum*, 929 F.2d 922, 924-25 (2d Cir. 1991)).

[131]     *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

[132]     *Williams v. City of Mount Vernon*, 428 F. Supp. 2d 146, 153 n.2 (S.D.N.Y. 2006).

immunity defense."[133]

There are three steps in a qualified immunity analysis. The court first must determine whether, "taken in the light most favorable to the party asserting the injury . . . the officer's conduct violated a constitutional right . . . ."[134] If there is no constitutional violation, the defendant is not liable and the court need not proceed further. If, however, the plaintiff proves a constitutional violation, the court moves to the second step, which asks whether or not, at the time of the violation, the law prohibiting the defendant's conduct was clearly established.[135] If the violated right was not clearly established, the officer is immunized from liability. "Clearly established" means: "(1) the law is defined with reasonable clarity, (2) the Supreme Court or Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.'"[136] If the law prohibiting defendant's conduct was clearly established, the court moves to the final step in the analysis, which asks whether

---

[133]     *Mitchell v. Forsyth*, 472 U.S. 511, 556 n.10 (1985) (Brennan, J., concurring in part and dissenting in part) (citing *Brandon v. Holt*, 469 U.S. 464, 472-73 (1985)).

[134]     *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

[135]     *See id.*

[136]     *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003) (quoting *Young v. County of Fulton*, 160 F.3d 899, 903 (2d Cir. 1998)) (alterations in *Anderson*).

or not "'it was objectively reasonable for [the defendant] to believe that his actions were lawful at the time of the challenged act.'"[137] An official's conduct is objectively unreasonable, and not eligible for qualified immunity, "when no officer of reasonable competence could have made the same choice in similar circumstances."[138]

### G.     The *Rooker-Feldman* Doctrine

In *Rooker v. Fidelity Trust Co.*, the Supreme Court held that federal district courts "lacked the requisite appellate authority, for their jurisdiction was 'strictly original.' Among federal courts, the *Rooker* Court clarified, Congress had empowered only [the Supreme Court] to exercise appellate authority 'to reverse or modify' a state-court judgment."[139] In *District of Columbia Court of Appeals v. Feldman*, the Court further clarified that state court proceedings that were "judicial in nature" were reviewable only by the Supreme Court or by the highest court of

---

[137]     *Anthony v. City of N.Y.*, 339 F.3d 129, 137 (2d Cir. 2003) (quoting *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995)).

[138]     *Id.* at 138 (quotation marks omitted).

[139]     *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005) (internal citations omitted). *Accord Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 416 (1923).

the state.[140]  A denial of bar admission to two men who had not graduated from

ABA accredited law schools by the Court of Appeals for the District of Columbia

was considered a proceeding that was "judicial in nature" by the *Feldman* Court,

and therefore not reviewable by the district court.[141]

## IV.   DISCUSSION

### A.   Failure to Allege Wrongdoing

Plaintiffs allege that a large number of defendants are involved in

either the conspiracy or some other wrongdoing.  However, many of these

allegations are entirely conclusory.  Plaintiffs simply fail to allege any facts that

suggest wrongdoing.  In many cases, plaintiffs infer a defendant's participation in

the conspiracy from the defendant's refusal to investigate that conspiracy.[142]

Plaintiffs have named other individuals as defendants without any explanation.  In

the absence of specific factual allegations as to the actions a defendant took to

---

[140]   *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 476
(1983). *Accord Exxon Mobil*, 544 U.S. at 285.

[141]   *Feldman*, 460 U.S. at 479-82.

[142]   *See, e.g.,* Compl. ¶ 743 ("After being apprized of the illegal activities
by Iviewit Companies, none of the defendants in public office positions charged
with investigating as defined herein made reasonable effort [sic] to investigate
report or remedy the illegal activities, therefore engaging in a conspiracy by
condoning the activities through their inactions.").

incur liability that are sufficient to put the defendant on notice of what conduct is at issue, claims against that defendant must be dismissed.[143]   All claims against the defendants listed in Appendix A are dismissed because they are not alleged to have engaged in wrongful conduct.

## B.   Immunity

### 1.   The Eleventh Amendment

Neither the State of New York, the Commonwealth of Virginia, nor the State of Florida has consented to be sued in this action, and Congress has not abrogated state immunity for plaintiffs' claims.  Therefore, this Court has no jurisdiction to hear any claims against the States.  All claims against the States of New York and Florida and the Commonwealth of Virginia are therefore dismissed. The Florida Supreme Court is an arm of the State of Florida.[144]   The Appellate Divisions of the New York State Supreme Court are arms of the State of New York.[145]   Therefore, all claims against these defendants are dismissed.

---

[143]   *See Leibowitz v. Cornell Univ.*, 445 F.3d 586, 591 (2d Cir. 2006) ("[A] plaintiff is required only to give a defendant fair notice of what the claim is and the grounds upon which it rests.").

[144]   *See* Fla. Const. art. 5, § 1.

[145]   *See* N.Y. Const. art. 6, § 1.  Further, these entities cannot be sued under section 1983 because they are not "persons."  *See Zuckerman v. Appellate Div., Second Dep't, Supreme Court of State of N.Y.*, 421 F.2d 625, 626 (2d Cir.

33

The New York State Legislature has vested the exclusive jurisdiction

to discipline attorneys in the four departments of the Appellate Division of the

Supreme Court.[146]  The Departments have delegated to the Departmental

Disciplinary Committees their judicial function of investigating charges of

attorney misconduct.[147]  Accordingly, each Committee, like the disciplinary and

---

1970) ("[I]t is quite clear that the Appellate Division is not a 'person' within the meaning of 42 U.S.C. § 1983.").

[146]     The Judiciary Law of the State of New York states:

> The supreme court shall have power and control over attorneys and counsellors-at-law and all persons practicing or assuming to practice law, and the appellate division of the supreme court in each department is authorized to censure, suspend from practice or remove from office any attorney and counsellor-at-law admitted to practice who is guilty of professional misconduct, malpractice, fraud, deceit, crime or misdemeanor, or any conduct prejudicial to the administration of justice . . . .

N.Y. Judiciary Law § 90(2).

[147]     New York State regulations state as follows:

> This court shall appoint a Departmental Disciplinary Committee for the Judicial Department, which shall be charged with the duty and empowered to investigate and prosecute matters involving alleged misconduct by attorneys who, and law firms that, are subject to this Part and to impose discipline to the extent permitted by section 603.9 of this Part.

34

grievance committees in other jurisdictions, "is a delegatee of the powers of the

Appellate Division as an aid to that Court in carrying out its statutory

functions."[148]  The Committees are thus arms of the State.[149]  All claims against

them are dismissed because they are immune from suit under the Eleventh

Amendment.[150]  Similarly, the Florida Office of the State Courts Administrator, the

New York Office of Court Administration of the Unified Court System, the State

of New York Commission of Investigation, the Florida State Bar, and the Virginia

State Bar are arms of their respective States.  All claims against these defendants

are dismissed as well.

## 2.    Judicial and Quasi-Judicial Immunity

Plaintiffs have alleged that various judges, including the justices of

the Florida Supreme Court and of the New York Supreme Court, Appellate

---

N.Y. Comp. Codes R. & Regs., tit. 22, § 603.4(a).

[148]    *Rappoport v. Departmental Disciplinary Comm. for First Judicial Dep't*, No. 88 Civ. 5781, 1989 WL 146264, at *1 (S.D.N.Y. Nov. 21, 1989).

[149]    *See id.* ("The Departmental Disciplinary Committee of the First Judicial Department . . . is an arm of the State for Eleventh Amendment purposes.").

[150]    *See Jackson v. Manhattan & Bronx Surface Transit Operating Auth. (M.B.S.T.O.A.)*, No. 92 Civ. 2281, 1993 WL 118510, at *2 (S.D.N.Y. Apr. 13, 1993) ("[D]amage claims against . . . [the] Departmental Disciplinary Committee are barred by the Eleventh Amendment.").

35

Division, First Department, have failed to uphold their judicial responsibilities,

either by acting negligently or through malicious actions. They have further

alleged that certain judges are members of the conspiracy against them. However,

the alleged wrongdoings took place in the context of judicial proceedings where

the courts had at least arguable jurisdiction over the relevant matters. Further,

individuals who are not judges but "who perform functions closely associated with

the judicial process" are protected by quasi-judicial immunity.[151] For these

reasons, all claims for damages against the defendants listed in Appendix B in

their official capacities are dismissed.[152]

### 3.    Qualified Immunity

Qualified immunity protects officials who are sued in their individual

capacities in certain circumstances. It applies if, *inter alia*, the defendant's

conduct fails to violate clearly established federal law. In the situations described

by plaintiffs, there is no clearly established right to have complaints investigated

---

[151]    *See Oliva*, 839 F.2d at 39.

[152]    *See Polur v. Murphy*, No. 94 Civ. 2467, 1995 WL 232730, at *5
(S.D.N.Y. April 19, 1995) ("[T]he functions of the DDC, a Hearing Panel thereof,
and the DDC counsel, in relation to attorney disciplinary proceedings are akin to
those of both a hearing examiner and a prosecutor, and individuals serving in
those capacities should appropriately be accorded immunity from suit for their
conduct.").

or pursued.  Therefore, all claims for damages against the defendants listed in

Appendix C in for failure to investigate or failure to prosecute are dismissed.

### C.    Statute of Limitations

Statutes of limitations "are found and approved in all systems of

enlightened jurisprudence," and with good reason.[153]  Over time, evidence

vanishes, memories fade, witnesses disappear.[154]  After sufficient time, "the right

to be free of stale claims in time comes to prevail over the right to prosecute

them."[155]  Thus, "strict adherence to limitation periods 'is the best guarantee of

evenhanded administration of the law.'"[156]

Many of plaintiffs' claims are barred by statutes of limitations.

Plaintiffs assert that the statutes should not apply because it is contrary to the

"public interest," arguing that they had to wait "until enough evidence has been

---

[153]    *Wood v. Carpenter*, 101 U.S. 135, 139 (1879).

[154]    *See Order of R.R. Telegraphers v. Railway Exp. Agency*, 321 U.S.
342, 348 (1944).  *See also Bell v. Morrison*, 26 U.S. 351, 360 (1828) (observing
that the statute of limitations "is a wise and beneficial law . . . [designed] to afford
security against stale demands, after the true state of the transaction may have
been forgotten, or be incapable of explanation, by reason of the death or removal
of witnesses").

[155]    *Order of R.R. Telegraphers*, 321 U.S. at 349.

[156]    *Carey v. International Bhd. of Elec. Workers Local 363 Pension Plan*,
201 F.3d 44, 47 (2d Cir. 1999) (quoting *Mohasco Corp. v. Silver*, 447 U.S. 807,
826 (1980)).

ascertained that the actions of the would be defendants have become sufficiently evident . . . ."[157] However, statutes of limitations themselves serve the public interest.  In the absence of a legal basis for tolling or estoppel, the Court cannot disregard the rules.  Because plaintiffs have not raised a valid ground for the tolling of any statute of limitations or the application of equitable estoppel, the statutes of limitations apply without modification.

### 1.    Section 1983

Claims brought under section 1983 must be filed within three years of the date on which they accrue.  This action was filed on December 12, 2007.  Therefore, plaintiffs cannot assert any cause of action pursuant to section 1983 for events that occurred before December 12, 2004.  Although the nature of the Complaint makes it difficult to ascertain the exact dates of some events, plaintiffs allege that the underlying conspiracy regarding the theft of the Inventions occurred before 2004.  All section 1983 claims relating to this conspiracy are therefore dismissed.

Plaintiffs allege that the conspiracy involving the State of Florida

---

[157]    Co-Plaintiff Lamont's Opposition to the Meltzer Defendants Cross Motion to Dismiss ("Pl. Meltzer Mem.") at 18.

occurred in "Spring 2003 to Spring 2004 . . . ."[158]  All section 1983 claims relating to this conspiracy are therefore dismissed.  Similarly, alleged wrongdoing by the Lawyers Fund for Client Protection of the State of New York occurred in 2003.[159]  These claims are therefore dismissed.

Plaintiffs allege that the conspiracy involving the 1st DDC occurred in Spring through Summer of 2004.[160]  All section 1983 claims relating to the 1st DDC are therefore dismissed.

### 2.    The Sherman Act

Plaintiffs allege that defendants "create[d] an illegal monopoly and restraint of trade in the market for video and imaging encoding, compression, transmission, and decoding by, including but not limited to, the IP pools of MPEGLA LLC . . . ."[161]  These actions were allegedly taken in the years 1998 through 2001.  These claims are therefore dismissed.

### 3.    RICO

Plaintiffs allege that the injury underlying their RICO claims is "the

---

[158]    Compl. ¶ 607.

[159]    *See id.* ¶ 688.

[160]    *See id.* ¶¶ 638, 646.

[161]    *Id.* ¶ 1073.

theft of IP by the enterprise and its agents . . . ."[162]  The alleged theft happened

well before 2003.  This claim is therefore barred by the statute of limitations.

### D.    Failure to State a Claim

#### 1.    Title VII of the Civil Rights Act of 1964

Count Three of the Complaint alleges that

> The conspiratorial actions of the defendants in sabotaging
> IP applications through fraud, denying property rights of
> the IP, the ensuing white washing of attorney complaints
> by the defendants and other culpable parties both known
> and unknown with scienter, creating an illegal monopoly
> and restraint of trade, thereby denies Plaintiffs' [sic] the
> opportunity to make and enforce contracts, to sue, be
> parties, give evidence, and the entitlements to the full and
> equal benefit of all laws and proceedings for the security of
> persons violates Title VII of the Civil Rights Act of 1964
> (as amended).[163]

Title VII of the Civil Rights Act of 1964 addresses employment

discrimination.  There is no reading of the Complaint that suggests any defendant

committed any action prohibited by Title VII.  Count Three is therefore dismissed.

#### 2.    The Copyright and Patent Clause

Article I, Section 8 of the Constitution provides that "Congress shall

have the power . . . [t]o promote the Progress of Science and useful Arts, by

---

[162]    Compl., RICO Statement Form, question (iv), at 180.

[163]    Compl. ¶ 1077.

securing for limited Times to Authors and Inventors the exclusive Right to their

respective Writings and Discoveries . . . ."  One possible reading of plaintiffs' first

cause of action is that they are alleging a violation of this clause.

On its face, the Copyright and Patent Clause confer discretionary

authority on Congress to pass laws relating to patents and copyrights.  The text of

the clause does not suggest any private right of action against any state or non-

state actor, and I am not aware of any court that has created such a right.  Because

the Copyright and Patent Clause does not bestow any rights on individuals,

plaintiffs' claim under this Clause is dismissed.

### 3.    Section 1983

The only section 1983 claims that have not been dismissed on the

grounds of statute of limitations and immunity are those that seek injunctive relief

against certain state officials in connection with state attorney disciplinary

procedures.  To state a claim pursuant to section 1983, a plaintiff must allege that

a constitutional right has been violated.  As discussed above, plaintiffs have no

cognizable interest in attorney disciplinary procedures or in having certain claims

investigated.  Plaintiffs have therefore failed to state a claim against these

defendants.

41

### E.    Further Observations

#### 1.    The *Rooker-Feldman* Doctrine

All of plaintiffs' federal claims have been dismissed, either pursuant to the relevant statutes of limitations, the Eleventh Amendment, or judicial immunity. Were plaintiffs' claims not otherwise dismissed, exercise of jurisdiction over certain of those claims would likely violate the *Rooker-Feldman* doctrine. Several of plaintiffs' claims are essentially arguments that the state courts failed to give their state court suits adequate consideration.[164] Federal district courts have no jurisdiction to review the decisions of state courts. Regardless of the merit of plaintiffs' claims, this Court cannot exercise jurisdiction over them.[165]

#### 2.    Rule 8(a)

Plaintiffs repeatedly promise that if their allegations are considered

---

[164]    *See, e.g.,* Compl. ¶ 601 ("That this Court will see that not only did [the Florida Supreme Court] err in a decision but their actions were coordinated to further usurp due process and procedure with the direct intent of covering for their brethren, [The Florida Bar] members and to further aid and abet the conspiracy.").

[165]    I also note that the Court likely cannot exercise personal jurisdiction over many of the defendants. Because there are sufficient other grounds for dismissal of this action, I do not discuss this issue any further.

conclusory, they will amend their Complaint to include more detail.[166]  Plaintiffs

misunderstand their pleading burden.  To state a claim under Rule 8(a), plaintiffs

are only required to give a "a short and plain statement of the claim showing that

the pleader is entitled to relief . . . ."[167]  Plaintiffs' claims fail not because they

have given insufficient detail as to the alleged conduct, but rather because much of

the alleged conduct does not constitute a violation of any statute and because the

remaining claims are barred by statutes of limitations or immunity.  Plaintiffs have

provided not too little detail, but too much – by no stretch of the imagination can

the Complaint be considered "short and plain."  Were I not to dismiss all claims

for other reasons, I would strike the Complaint for violating Rule 8(a).[168]

### 3.    Standing

Several of plaintiffs' claims relate to the alleged failure of various

defendants to take appropriate steps in various attorney disciplinary procedures.  A

---

[166]    *See, e.g.,* Pl. Meltzer Mem. at 11 ("Should the Court view the allegations . . . as conclusory, Plaintiffs will, when the Court further schedules depositions in the instant case, insert the deposition testimony of each and every client that were introduced to the IP by the Proskauer Defendants.").

[167]    Fed. R. Civ. P. 8(a)(2).

[168]    Ordinarily, I would strike a Complaint of this ilk immediately upon its filing and permit plaintiffs to file a shorter, more concise Complaint.  However, the instant situation required a swift determination of whether plaintiffs can state a claim against any defendant.

non-party generally has no legally protected interest that is affected by such failure. In the absence of such an interest, a plaintiff has no standing to assert a claim.[169] Because they have no cognizable interest in having criminal or civil proceedings brought by the Government against the various defendants, plaintiffs cannot state a claim against government officials for failing to initiate those proceedings.

## F.   Supplemental Jurisdiction and Leave to Replead

When a plaintiff has not alleged diversity jurisdiction and her federal claims fail as a matter of law, courts generally decline to exercise supplemental jurisdiction over remaining state law claims.[170] Here, all federal law claims have been dismissed, and there is no reason to depart from this general rule. I therefore dismiss plaintiffs' state law claims.

---

[169]   *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

[170]   *See* 28 U.S.C. § 1367(c)(3) (stating that a district court may decline to exercise supplemental jurisdiction over a claim if, *inter alia*, "the district court has dismissed all claims over which it has original jurisdiction"). *See also Martinez v. Simonetti*, 202 F.3d 625, 636 (2d Cir. 2000) (directing dismissal of state law claims when no federal claims remained); *Adams v. Intralinks, Inc.*, No. 03 Civ. 5384, 2004 WL 1627313, at *8 (S.D.N.Y. July 20, 2004) ("In the usual case in which all federal law claims are eliminated before trial, the balance of factors to be considered under the [supplemental] jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state law claims.") (quotation and citation omitted).

A pro se plaintiff should be permitted to amend her complaint prior to its dismissal for failure to state a claim "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim."[171]  However, "it is well established that leave to amend a complaint need not be granted when amendment would be futile."[172]  Plaintiffs have burdened this Court and hundreds of defendants, many of whom are not alleged to have engaged in wrongdoing, with more than one thousand paragraphs of allegations, but have not been able to state a legally cognizable federal claim against a single defendant.  There is no reason to believe they will ever be able to do so.  Plaintiffs cannot overcome the various immunity defenses or the pertinent statutes of limitations.  Leave to replead is denied.  However, this in no way speaks to whether they may be able to plead valid state law claims.

## V.    CONCLUSION

For the reasons stated above, defendants' motions to dismiss are granted.  The remaining defendants are dismissed sua sponte.  The Clerk of the Court is directed to close these and related motions (documents no. 12, 47, 48, 65, 66, 68, 73, 75, 78, 81, 83, and 97 on the docket sheet) and this case.

---

[171]    *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999).

[172]    *Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            August 8, 2008

## - Appearances -

**Plaintiffs (pro se):**

Eliot I. Bernstein
39 Little Avenue
Red Bluff, California 96080
(530) 529-4410

P. Stephen Lamont
35 Locust Avenue
Rye, New York 10580
(914) 217-0038

**For Defendant the State of New York:**

**For Defendant Raymond A. Joao:**

Monica Connell
Assistant Attorney General for the State
  of New York
120 Broadway
New York, New York 10271
(212) 416-8610

John Walter Fried, Esq.
Fried and Epstein
1350 Broadway, Suite 1400
New York, New York 10018
(212) 268-7111

**For Defendants Boggs, Marvin, Hoffman, Turner, and the Florida Bar:**

Glenn T. Burhans, Jr., Esq.
Greenberg Traurig, LLP
101 East College Ave.
Tallahassee, Florida 32301
(850) 521-8570

**For Defendants Meltzer Lippe Goldstein & Breitstone LLP and Meltzer:**

Richard M. Howard, Esq.
Meltzer, Lippe, Goldstein & Breitstone, LLP
190 Willis Avenue
Mineola, New York 11501
(516) 747-0300

**For Defendants Krane, Rubenstein, the Estate of Stephen Kaye, and Proskauer Rose, LLP:**

Joanna Smith, Esq.
Proskauer Rose, LLP
1585 Broadway
New York, New York 10036
(212) 969-3437

**For Defendants Foley Lardner LLP, Grebe, Dick, Boehm, and Becker:**

Kent Kari Anker, Esq.
Lili Zandpour, Esq.
Friedman, Kaplan, Seiler and Adelman
1633 Broadway
New York, New York 10019
(212) 833-1244

**For Defendants Hoffman, Turner, Boggs, and Marvin:**

Glenn Thomas Burhans, Jr., Esq.
Greenberg Traurig
101 East College Avenue
Tallahassee, Florida 10022
(850) 521-8570

**For Defendant the Virginia State Bar:**

Stephen M. Hall
Assistant Attorney General for the State of Virginia
900 E. Main Street
Richmond, Virginia 23219
(804) 786-2071

# Appendix A

Christopher & Weisberg, P.A.; Alan M. Weisberg; Robert Flechaus, detective, Boca Raton; Andrew Scott, Chief of Police, Boca Raton; the City of Boca Raton; Huizenga Holdings, Inc.; Alberto Gonzales, Attorney General of the United States; Johnnie E. Frazier, Inspector General of the United States Department of Commerce; Kelly Overstreet Johnson, attorney for and former president of the Florida Bar; The New York State Commission of Investigation; Alan S. Jaffe, Robert J. Kafin, Gortz, Gregory Mashberg, Leon Gold, and Matthew M. Triggs, partners at Proskauer; Christopher Pruzaski, Mara Lerner Robbins, Donald "Rocky" Thompson, Gayle Coleman, David George, Joanna Smith, James H. Shalek, Joseph A. Capraro Jr., George A. Pincus, Kevin J. Healy, Stuart Kapp, Ronald F. Storette, Chris Wolf, Jill Zammas, Jon A. Baumgarten, Scott P. Cooper, Brendan J. O'Rourke, Lawrence I. Weinstein, William M. Hart, Daryn A. Grossman, Marcy Hanh-Saperstein, and Gregg Reed, associates at Proskauer; IBM; Frank Martinez, partner at MLG; Michael C. Grebe, Todd Norbitz, and Anne Sekel, partners at Foley; the Lawyers Fund for Client Protection of the State of New York; the Estate of Stephen Kaye; the Hon. Judith S. Kaye; the European Patent Office; SBTK; Furr & Cohen, P.A.; Gerald W. Stanley, Chief Executive Officer of Real; David Bolton, General Counsel of Real; Tim Connolly, Director of Engineering at Real; Rosalie Bibona, engineer at Real; Larry Palley, employee of Intel; Masaki Yamakawa, the Yamakawa International Patent Office; TIG; Bruce T. Prolow, officer of TIG; Carl Tiedemann, officer of TIG; Andrew Philip Chesler, officer of TIG; Craig L. Smith, officer of TIG; and all employees and members of law firms who are not explicitly named in the Complaint.[173]

---

[173]  *See, e.g.,* Compl. ¶ 27 (naming as defendants all partners, associates, and counsel at Proskauer Rose who profited from the alleged incidents).